**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  CRIMINAL NO. 12-1246 WJ

JIANYU HUANG,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO DISMISS COUNTS 1-7 OF THE**
**SUPERSEDING INDICTMENT FOR GOVERNMENT'S FAILURE TO COMPLY**
**WITH _GARRITY V. NEW JERSEY_ AND _KALKINES V. UNITED STATES_**

THIS MATTER comes before the Court following four hearings which were held on Defendant's Motion to Dismiss Counts 1-7 of the Superseding Indictment for Government's Failure to Comply with _Garrity v. New Jersey_ and _Kalkines v. United States,_ filed January 31, 2014 **(Doc. 144)**.   In this motion, Defendant seeks to dismiss all counts in the Indictment and Superseding Indictment (Counts 1-7).  Having considered counsel's briefs and arguments, and the testimony and evidence presented at the hearing, the Court finds that Defendant has not satisfied the standard under _Garrity_ in showing a violation of his Fifth Amendment rights. Accordingly, Defendant's motion is DENIED.

**BACKGROUND**

Defendant Jianyu Huang is a physicist who was hired by Sandia in 2006 as temporary staff to work at the Center for Integrated Nanotechnologies ("CINT") as an expert in Transmission Electron Microscopy ("TEM").   Following his naturalization as a United States

citizen in December 2008, Sandia changed his position IN 2009 to a permanent member of the technical staff.[1]

The seven-count Superseding Indictment (Doc. 132, Redacted) charges Dr. Huang with five counts of Federal Program Fraud, 18 U.S.C. § 666(a)(1)(A) (Counts 1-5), alleging that Dr. Huang was an agent of Sandia National Laboratories (Sandia), that Sandia receives in excess of $10,000 annually from the Department of Energy, and that Dr. Huang "embezzled, stole, obtained by fraud, intentionally misapplied and without authority knowingly converted to the use of persons not the rightful owner . . . [Sandia] property worth at least $5,000."   Count 6 alleges a violation of 18 U.S.C. § 1001(a)(2) (Making a False Statement), referring to Defendant's statement to a Sandia Counterintelligence Officer that he did not intend to take his Sandia laptop on a scheduled trip to China.   Count 7 alleges a theft of Sandia property referring to the Sandia laptop computer that Dr. Huang took to China.  Count 8 was added by another Superseding Indictment (Doc. 215), charging Defendant with theft and conversion of Government property, namely electronic files and documents, which took place between April 25, 2012 and June 2, 2012, in violation of 18 USC § 641.

The compelled statements at issue here are related to Count 6 concerning Defendant's unauthorized use of a Sandia laptop on a trip to China in June 2011.   The specific statements are: the statement made by Defendant during a briefing prior to his trip to China and subsequent statements made to his supervisors during Sandia's investigation of the laptop's seizure by Customs and Border Protection at the San Francisco International Airport in July 2011.

## I.      Legal Standard

In  *Garrity v. New Jersey,* 385 U.S. 493 (1967), the Supreme Court held that the Fifth Amendment privilege against self-incrimination bars the government from using statements

---

[1]  *See* Transcript of Hearing, Doc. 289 at 279-280.

compelled under a threat of job loss in a subsequent criminal prosecution.  *Id*. at 500.   In *Kalkines v. U.S.,* 473 F.2d 1391 (Ct.Cl. 1973), the *Garrity* doctrine was extended to apply to federal employees who are compelled to answer questions under threat of job termination.   A *Garrity* or *Kalkines* ("*Garrity"* hereinafter) "warning" to an employee informs the employee that he must make a statement or face termination but that any statement so made cannot be used in a subsequent criminal prosecution.  *U.S. v. Slough*, 677 F.Supp.2d 112 (D.D.C. 2009), *vacated on other grds*., 641 F.3d 544 (C.A.D.C. 2011).  This means that an individual cannot be discharged simply because he invokes his Fifth Amendment privilege against self-incrimination in refusing to respond; or, conversely, statements coerced by the employee by threat of removal from office in an earlier disciplinary investigation cannot be used in a subsequent prosecution.  *Kalkines*, 473 F.2d at 1393.

The first part of the inquiry is whether Fifth Amendment protections are implicated.   The Government has conceded that state action existed in obtaining certain statements from Defendant, and thus there is no need to engage in this first part of the analysis.   For the second part of a *Garrity* analysis, a defendant must show (1) that he subjectively believed that his statements were compelled by the threat of job loss, and (2) that this belief was objectively reasonable.  *U.S. v. Vangates*, 287 F.3d 1315 (11th Cir. 2002).

## II.    Factual Chronology

The parties' briefs (Docs. 144 & 156) contain an adequate description of the facts which are relevant to this motion, which can be summed up as follows:[2]

A.    <u>Statements Made Prior to Trip to China</u>

---

[2]   To reduce confusion, the Court omits references to exhibits cited in the briefs to the *Garrity/Kalkines* motion, since they are easily obtained from the pleadings (Docs. 144 & 156).   Instead, in its discussion and analysis, the Court will reference exhibits submitted at the hearings on the motions, unless otherwise specified.

In April of 2011, Dr. Huang submitted an international travel request, asking for Sandia's authorization for him to travel to Shenyang, China, at government expense, from July 2, until July 16, 2011.  As part of a routine travel security briefing for Sandia employees planning to travel to foreign countries, Sandia Counterintelligance ("CI") Officer Jacqueline Jahner contacted Defendant on June 8, 2011 to discuss the trip.  During this pre-trip interview, which was conducted telephonically, Defendant stated that he was not going to take any Sandia owned electronic equipment on the upcoming trip to China, but would be taking a personal computer on the trip instead.  He also told Ms. Jahner that he would not be taking a Sandia computer or Blackberry device.

Dr. Huang left Albuquerque for San Francisco and then to Beijing, China on June 30, 2011.  On his way back from China on July 18, 2011, Huang was stopped and searched in San Francisco International Airport by Customs and Border Protection ("CBP").  Dr. Huang told the CBP agents that the laptop he had taken to China was the property of Sandia he used for a PowerPoint presentation.   The laptop and hard drive were seized.

B.    Statements Made to Supervisors After Return and Confiscation of Laptop

On the day following the confiscation of the laptop, Dr. Huang notified his immediate supervisor, Sean Hearne, about the "problem" he encountered the day before when arriving in San Francisco.   Mr. Hearne responded to Dr. Huang by e-mail, thanking him for writing and stating that Dr. Huang's top priority now was to assist the investigation in any way he could.[3] Mr. Hearne also advised that he and another one of Defendant's direct-line Sandia supervisors, Neal Shinn, would start a SIMP ("Security Incident Management Program") investigation to determine what needed to happen next.   Mr. Hearne sent another e-mail to Dr. Huang a couple

---

[3] *See* Gov't Ex. 13 (e-mail from Hearne to Defendant, stating: "Thank you very much for emailing me.  Your top priority right now is to assist the investigation in every way you can" and "Please send us a full description of what occurred. . . ."

of hours later and asked Dr. Huang to send him a "full description" of what happened, including

what "government property you took. . . what information was stored on them (include what

level the information stored on it is. . . ) what if any networks you connected them too [sic] and

where the equipment is currently located."   On July 20, 2011, Dr. Huang responded by e-mail to

Mr. Hearn's request for a full description of what occurred, attaching a two-page account of his

trip to China and his encounter with CBP personnel at the airport.   *See* Gov't Exs. 12, 13, 14 &

15; *see also* Doc. 156 at 8-9.

C.    Statements Made Regarding SIMP Inquiry

On August 18, 2011, SIMP Inquiry Official Constance Koch contacted Ms. Jahner

about her travel "prebrief" with Defendant, to which Ms. Jahner responded by e-mail.   Ms.

Jahner described the routine questions that are asked in a "debrief," explaining that the questions

are tailored to the individual and the situation.   Gov't Ex. 19.

Ms. Koch interviewed Dr. Huang on August 18th.   The interview took the form of

providing written questions to Dr. Huang, and permitting him to respond in writing.   Dr. Huang's

responses indicate that he knew it was a violation of Sandia policy to take Sandia laptops on

travel without prior approval.   On September 30, 2011, Ms. Koch contacted Dr. Huang by e-

mail to ask follow-up questions concerning whether the Sandia equipment had been in his

possession the entire time he was in China.   Dr. Huang responded there were two days during

which he had left the laptop in a hotel room, and in further exchanges, he provided the names

and locations of the hotels.  Gov't Ex. 20.[4]

---

[4]  Gov't Exs. 6, 7 & 8 constitute the SIMP case file regarding Defendant, along with the Security Incident
"Notification" report, which is a synopsis of Ms. Koch's inquiry into what Ms. Koch considered to be a security
concern for Sandia.   Ms. Koch had asked Dr. Huang to provide a written form of her interview with him, including
his responses to her questions during the interview. Exhibit 18 is a memorandum sent by Dr. Huang to Ms. Koch
recollecting the interview. Exhibit 19.   Exhibit 20 contains the e-mails on Ms. Koch's follow-up questions to Dr.
Huang.   Exhibits 25 and 26 are Dr. Huang's e-mails to Ms. Koch describing the presentations he gave in China,
with PDF filed attached.

The SIMP inquiry concluded in February of 2012, with a directive by the Security Coordinator, Mr. Ben Huff, that Dr. Huang had to take three online security classes.   The SIMP case would be closed once this was done.

D.     Statements Made to CRC

On April 24, 2012,   Dr. Huang provided a written statement to the Sandia Corporate Review Committee ("CRC"), which makes recommendations to Sandia management about discipline or termination of Sandia employees.   Defendant's statement was generally consistent with prior written statements to Mr. Hearne and Mr. Koch, recounting his trip to China, his decision to take Sandia equipment without authorization, and the encounter with the CBP officers at San Francisco Airport.   Defendant's CRC statement contains additional details about the time Dr. Huang spent in China, and his decision to take the equipment without authorization. It also included a detailed itinerary of Dr. Huang's trip to China from June 30 to July 18, 2011, including admissions to having made many presentations that had not been cleared through Sandia.  Defendant was terminated on or about April 28, 2012.

## II.    Procedural Background

In his motion to dismiss based on the underlying motion to dismiss, Defendant contends that the Court should conduct a *Kastigar* hearing in order to make a complete record on whether the Government must show that the Superseding Indictment was not tainted by statements compelled during an internal investigation, running counter to *Garrity v. New Jersey,* 385 U.S. 493 (1967) and *Kalkines v. U.S.*, 473 F.2d 1391 (Ct.Cl. 1973).[5]   The Government maintains that there was no need for a hearing and that Defendant's motion should be denied.

---

[5]   *Garrity* does not specifically refer to a "*Kastigar*" hearing in describing a hearing to determine the voluntariness of statements, but *Slough* does.   677 F.Supp.2d at 130. (citing *Kastigar v. U.S.* 406 U.S. 441 (1972)).

The Court held an initial hearing on Defendant's motion to dismiss on March 3, 2014 (*See* Docs. 162, 183, Clerk's Minutes). Following the hearing, the Court entered a Memorandum Opinion and Order concluding that a hearing was warranted "with regard to the question of whether Sandia should be considered an agency of the government" and granting Defendant's request to allow the testimony of a single witness, Ms, Jahner, the CI Officer at Sandia who pre-briefed Defendant prior to his trip to China. Doc. 190 at 8. The evidentiary hearing was held on April 10, 2014. Prior to the April 10th hearing, the government filed a Notice of Supplemental Response (Doc. 227) in which the Government advised that it would not contest a defense claim that Ms. Jahner was acting on behalf of the Department of Energy ("DOE") when she conducted the travel prebrief of Defendant in June 2011. The Government further informed the Court and defense counsel that it would not oppose Defendant's contention that Ms. Koch, the SIMP Inquiry Official, was also acting on behalf of DOE when she interviewed Defendant in August and September of 2011. In light of the Government's concession on this point, the Court advised the parties to be prepared to present evidence and argument on the second prong of the *Garrity* analysis at the hearings to follow on this motion. Doc. 230.

The Court heard testimony from Ms. Jahner at the April 10th hearing, and determined that testimony from additional witnesses involved in the internal investigation would be helpful. The Government recalled Ms. Jahner at the April 16th hearing, and presented testimony from two other witnesses, Ms. Constance Koch, who was the lead inquiry official for the SIMP investigation that took place with regard to Huang's use of a Sandia laptop which he took to China (and which forms the basis for Count 6), and Dr. Sean Hearne, Defendant's immediate supervisor. Defendant also testified at the April 16th hearing. On May 9, 2014, testimony continued with the Government's cross-examination of Defendant and with the examination of

the individuals who were involved with the CRC hearing: Karen Gardner, Director of Human Resources at Sandia; Dr. Charles Barbour, "line director" at Sandia; and Dr. Maryann Walck, "pool director."   The latter two individuals were supervisors, one in the direct line of supervision and the other a supervisor over a broader group of employees, respectively.   At the conclusion of the hearings, the Court ordered the parties to submit briefs summing up the evidence and relevant law, which they have done.   *See* Docs. 297 & 298.

## DISCUSSION

Defendant has not been clear about which specific statements he contends violated his Fifth Amendment privilege against self-incrimination under *Garrity*.   Given that there were numerous statements given by Dr. Huang to various supervisors and Sandia officials, the Government was at a disadvantage in responding to Defendant's generic arguments, and the Court was unclear about how to frame an appropriate analysis.   At the last hearing, however, defense counsel finally identified the following statements which he contends were compelled and thus, must be suppressed:

    (1)      Statement Defendant made to Ms. Jahner in the pretrip briefing;

    (2)      Statement Defendant provided to his chain of command immediately after his return from China; and

    (3)      Statement Defendant provided to the SIMP inquiry.

Transcript of Hearing ("Tr."), Doc. 276 at 613-14:13-25, 1-12.[6]   In defense counsel's oral description of the statements above, he identified the statements made to SIMP as separate from the statement Dr. Juang made to his chain of command immediately upon his return from China.

---

[6]   The transcripts of the four hearings were filed separately, with the page numbers continuing throughout.   Doc. 288 contains pages 1-208 for the April 10th hearing; Doc. 289 contains pages 209-421 for the April 16th hearing; Doc. 275 contains pages 422-545 for the May 9th hearing; and Doc. 276 contains pages 546-617 for the May 13th hearing.   References will be to the particular docket number of the transcript and the relevant portions in that transcript.

At the same time, however, defense counsel stated that the statement Dr. Juang made to SIMP includes the statement made to his supervisors,[7] probably because, as counsel noted, the statement Dr. Huang made to his supervisors "was ultimately used for the SIMP."  Tr., doc. 276 at 614:7-9.  In the interest of clarity, the Court groups the statement to Dr. Shinn and Dr. Hearne separately from the statement made to Ms. Koch as part of the SIMP inquiry because counsel described the statement to Dr. Shinn as an "immediate statement" which the Court assumes refers to the statement Dr. Huang made immediately on his return from China.

The Fifth Amendment's protection against self-incrimination applies only to statements compelled by the government, and thus the first prong of the *Garrity* analysis is whether Dr. Huang's statements were made to a federal or state official.   *See, e.g., United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975) (inquiry about financial irregularities by the New York Stock Exchange ("NYSE") did not involve state action for purposes of *Garrity* because the NYSE was pursuing its own interests and obligations and not as an agent of the Securities and Exchange Commission, which was an arm of the government).  As mentioned previously, the Government does not contest that Ms. Jahner's pre-trip briefing and Ms. Koch's interviews in August and September of 2011 were actions done on behalf of DOE.   Defendant has conceded that any statements made by Dr. Huang to the CRC do not involve a Fifth Amendment inquiry because the CRC did not involve state action (as well as because the statements were not compelled).  Tr., Doc. 276 at 614; *see also* Doc. 254.

The Government's brief tracks the grouping of three statements identified by Defendant at the last hearing.  However, Defendant's brief is almost entirely devoted to the argument of

---

[7]  *See* Tr., Doc. 276 at 613:23-25; 614 at 1):
   Mr. Gorence:  . .  And secondly would be the statement that was provided to the SIMP.
   The Court:    That's the supervisors Hearne, Shinn, and Constance Koch?
   Mr. Gorence: Correct.

whether these statements were compelled.   There is no discussion on whether the statement

Defendant made to his chain of command immediately after his return from China involved state

action, and the Court will address this first.    The parties do not dispute the existence of state

action with regard to statements made to Ms. Jahner and Ms. Koch, and thus the sole question on

those statements is whether they were compelled.

**I.      Statements Provided Immediately After Return from China**

Upon his return from China, Defendant exchanged e-mails with his supervisors, Dr.

Shinn and Dr. Hearne and provided them with his statement regarding the loss of his laptop and

hard drive.   *See* Gov't Exs. 12, 13, 14 & 15.

The Court agrees with the Government that these statements represent purely private

conduct between an employee of a private firm and his immediate supervisors.   Sandia is a

contractor for the DOE, which is responsible for administration of part of the nation's research

and development of atomic energy.   However, Sandia Corporation is a private entity and as such,

is responsible for the operation and management of matters such as conduct and discipline of its

work force.   *See* Wright Decl., Gov't Ex. 1, at ¶ 3.   Subject to narrowly defined exceptions

which are inapplicable here, DOE has no role in Sandia's personnel decisions.   *Id*. at ¶ 7.   Here,

Sandia had its own internal reasons to inquire into Dr. Huang's activities.   These reasons include

a loss of Sandia equipment and a possible breach of security for Sandia, a contractor that does

business with DOE.

Throughout the briefing and hearings on this matter, Defendant has offered no evidence,

testimony or legal argument to suggest that either Dr. Shinn or Dr. Hearne was acting on behalf

of the state or federal government.    Defendant's statement to these two individuals later became

part of the SIMP inquiry, but how this statement was used afterward does not implicate *Garrity*

because the Fifth Amendment does not regulate private conduct.  *See U.S. v. Vangates,* 287 F.3d 1315, 1321 (11th Cir. 2002) (controlling factor in *Garrity* inquiry is "the fact that the state had involved itself . . . to coerce a person into furnishing an incriminating statement"); *see also U.S. v. Solomon,* 509 F.2d 863 (2d Cir. 1975) (no *Garrity* violation where the New York Stock Exchange was pursuing its own interests and obligations, and not as an agent of the Securities and Exchange Commission).

Thus, because Defendant's statement to Dr. Shinn and Dr. Hearne was not obtained by state action, the statement does not implicate *Garrity* and thus, there is no basis to suppress it.

## II.    Statements to Ms. Jahner

The remaining statements are those Dr. Huang made to Ms. Jahner in the prebriefing and to Ms. Koch in her interviews of Defendant during the SIMP inquiry.   The analysis would ordinarily move to the question of whether these statements were compelled, but there is a threshold matter to address first with respect to the statement made to Ms. Jahner.   The Government has conceded that Ms. Jahner was acting on behalf of DOE during the prebriefing, but has raised an interesting argument about this statement which the Court finds has merit.[8]

Count 6 is premised on Defendant's commission of a crime (making a false statement). Defendant seeks Fifth Amendment protection, not for a statement regarding this conduct, but for the conduct itself.   The false statement alleged in Count 6 is not based on admissions of prior criminal conduct that Defendant was compelled to make—in which case, *Garrity* could apply. Instead, the false statement count is based on Defendant's commission of a crime while

---

[8]   There is a good reason why the Government did not raise this argument until now.  At the time Defendant filed the Motion to Dismiss, it was not clear what statements were at issue.  Had Defendant been more explicit about which statements formed the basis for his motion, the Government would have "advised the Court that *Garrity* is simply inapplicable to statements that are charged as the *res gestae* of such offenses as false statement, perjury and obstruction of justice."  Doc. 297 at 18.

answering routine travel prebrief questions.  The Government contends that *Garrity* does not

apply to Dr. Huang's statement to Ms. Jahner.   *Cmp. Lefkowitz v. Turley,* 414 U.S. 70, 77 (1973)

("The object of the [Fifth Amendment] was to insure that a person should not be compelled,

when acting as a witness in any investigation, to give testimony that might tend to show that he

himself had committed a crime.")  Simply stated, a defendant cannot insulate himself under the

Fifth Amendment from prosecution for a statement made when that statement is itself the alleged

crime:

> *Garrity* provides that an officer under investigation may choose between refusing
> to cooperate with the investigation and losing his job or providing an
> incriminating statement and avoiding prosecution on that matter. "An accused
> may not abuse *Garrity* by committing a crime involving false statements and
> thereafter rely on *Garrity* to provide a safe haven by foreclosing any use of such
> statements in a prosecution for perjury, false statements, or obstruction of justice."
> *United States v. Veal*, 153 F.3d [1233,] 1243 [(11th Cir. 1998)].  *See also United
> States ex rel. Annunziato v. Deegan,* 440 F.2d 304, 306 (2d Cir. 1971) (upholding
> perjury conviction because "appellant was not prosecuted for past criminal
> activity based on what he was forced to reveal about  himself; he was prosecuted
> for the commission of a crime while testifying . . . ."); *United States v. Devitt*, 499
> F.2d 135, 142 (7th Cir. 1974) (holding that *Garrity* and its progeny "provide
> adequate protection of the witness's Fifth Amendment rights.  We find no reason
> or justification for extending this umbrella of protection to shield a witness
> against prosecution for knowingly giving false testimony."); *United States v.
> White*, 887 F.2d 267, 274 (D.C.Cir. 1989) (Ginsburg, J.) (explaining that the
> decision to lie is not protected by *Garrity*).

*United States v. Cook*, 526 F.Supp.2d 1, 9 (D.D.C. 2007), *affirmed*, 330 Fed. Appx. 1, 2009 WL

1528508 (D.C. Cir. 2009).

The travel prebrief conducted by Ms. Jahner was triggered simply by Dr. Huang's

submission of a form requesting authorization for official travel to a sensitive country.  Tr., Doc.

289 at 300:4-6 (prebriefing is "routine for every sensitive travel [in Ms. Jahner's focus area,

including China]").   Far from seeking to question Dr. Huang about prior, potentially criminal

conduct, CI Officer Jahner contacted the defendant to ask him about his upcoming trip, to advise

him of the need for care in interacting with foreign nationals from sensitive countries, and to remind him of the availability of Sandia's Laptops on Foreign Travel ("LOFT") program.

The Government's argument makes legal and common sense.   Otherwise, an employee could attempt to insulate himself from prosecution for any statement made in the course of his employment, including giving a routine report or answering questions about routine matters. *See Watson v. County of Riverside,* 976 F. Supp. 951, 955 (C.D.Cal. 1997) (*Garrity* and its progeny pertain to official questioning of an individual regarding suspected prior misconduct, and not to job requirement of completing a report).  *See also United States v. Rios Ruiz*, 579 F.2d 670, 675-76 (1st Cir. 1978) (admission of arrest report filed by defendant police officer as evidence in criminal prosecution for civil rights violation did not implicate right against self-incrimination).   Because Dr. Huang's statement to Ms. Jahner is the alleged lie itself, and not a potentially incriminating statement about the lie, it is not afforded Fifth Amendment protection. Therefore *Garrity* is inapplicable.

## III.    Whether Statements Were Compelled

The Court's final and most substantive inquiry addresses whether Dr.  Huang's statement during his interviews with Ms. Koch was compelled for *Garrity* purposes.  Defendant must show both  (1) that he subjectively believed that his statements were compelled by the threat of job loss, and (2) that this belief was objectively reasonable.   *Vangates*, 287 F.3d at 1315.

Dr. Huang testified that he believed that he would be fired if he did not cooperate with the investigation into the loss of the Sandia laptop and hard drive, and that he would not have made the statement to Ms. Koch (or any of the challenged statements) but for the threat of termination.   Defendant takes the stance that it is enough merely to show a *potential* threat of

termination in order to meet *Garrity* criteria,[9] but this is not an accurate statement of the law. "Threat of job loss" for purposes of the two-prong *Garrity* test does not merely mean that the defendant believed he was at some heightened risk of the possibility of being fired; rather, it means that the defendant held the belief that he *would be* fired if he declined to make his statement.   For example, the police officers who were under investigation in *Garrity* faced mandatory removal from office if they did not answer questions.[10]

Having established the contours of what is meant by "compulsion" under *Garrity*, the Court turns to the application of the two-prong question inquiry in this case.

A.     Defendant's Subjective Belief that Statements Were Compelled

Defendant testified at the hearing that he believed he would be fired if he did not answer Ms. Jahner's question at the prebriefing.   Tr., Doc. 289 at 292:16-19 and Doc. 289 at 292:16-25.[11]   Defendant's general stated belief was that he had to cooperate with Sandia's investigation, including the SIMP inquiry, and he would lose his job if he did not:

> Q.     Did you think that, after a request had been made, that you had the right to say, no, I don't want to answer your questions, and that you could still keep your job if you did that?

---

[9]   See Tr., Doc. 289 at 392-393:24-1 (asking witness whether it was true that Dr. Huang had to answer questions regarding the loss of his laptop computer at the San Francisco airport "or potentially face discipline."); Tr., Doc. 276 at 610-11 ("the law is that you are subject to [termination]"); Tr., Doc. 275 at 539:89-19 (referring to Defendant facing a "risk of termination").

[10]   *See U.S. v. Stein*, 233 F.3d 3, 15 (1st Cir. 2000) (risk of disbarment was not penalty within meaning of *Garrity* where disbarment would not follow "automatically without more" from refusal to testify before Board of Bar Overseers); *U.S. v. Lefkowitz*, 431 U.S. 801, 806 (1977) ("[D]amage to one's chances of retaining the privilege at stake does not necessarily establish a constitutional violation. The effect must be 'capable of forcing the self-incrimination which the Amendment forbids.'"); *U.S. v. Camacho*, 739 F.Supp. 15104, 1516 (S.D. Florida 1990). (defendant police officers had requisite subjective belief where union president advised them that they would be fired if they refused to answer).

[11]   The Court has already found that Dr. Huang's statement to Ms. Jahner does not come within the ambit of Fifth Amendment protection, and has further found that his statement to his supervisors immediately upon his return from China was not obtained by state action.   Thus, the Court need not go further into the *Garrity* analysis to determine whether these statements were compelled.   The Court references Defendant's testimony regarding these statements in the interest of thoroughness when considering whether Defendant was both credible and consistent.

> A.     No. I had to cooperate with the investigation. Whatever they ask me, I
>        have to provide.
>
> Q.     And if you don't, what would have happened to you?
>
> A.     They would have fired me.

Tr., Doc. 289 at 294:16-24.[12]   Defendant stated that he had "no doubt" that he would be fired if he did not provide an account of the lost laptop incident to his managers.  Tr., Doc. 289 at 299:1-15.

The Government contends that Defendant's claim of a subjective belief is not credible—and the Court agrees with this assessment.   In the very least, Defendant's testimony was sufficiently inconsistent as to weaken its integrity, making it impossible to find that his *Garrity* claim would fail under the second prong which requires that his belief was objectively reasonable.

Defendant's support for his claim of subjective belief is the Sandia Employee Handbook, which he claimed he read when he was hired in 2009.   However, the language in the Handbook undermines Defendant's claim of a subjective belief that he would have been fired if he did not make any of the challenged statement.   The pertinent language in the Handbook states that certain conduct, such as "[f]ailing to participate with a Corporate investigation," is "grounds for disciplinary action **up to and including termination.**"  Doc. 144-1 or Sandia Ex. 2.  These words do not suggest that termination would be automatic or mandatory if he chose not to show up for Ms. Jahner's pre-briefing or if he had declined to make statements during the SIMP inquiry.   Under DOE policy, contractors who worked for Sandia were expected to:

---

[12]  *See also* Tr., Doc. 289 at 296 (Defendant claiming that he made initial statements to Sean Hearne because he believed he would otherwise be fired); Tr., Doc. 276 at 560 ("I never voluntarily say, I want to tell you this, I want to tell you that. It's because they're investigating this. I have to cooperate – cooperate with the investigation").

> Comply with prebriefings as appropriate prior to the start of official foreign travel
> and provide debriefings as appropriate upon return by and at the discretion of the
> Office of Intelligence and Counterintelligence when travel is to a sensitive
> country, and/or interacting with sensitive country foreign nationals regardless of
> destination country, regardless of whether the traveler holds a security clearance.

Doc. 144-3 (Contractor Requirements Document, DOE Order regarding Official Foreign Travel)

at 16.   Defendant relied on this document, as well as the Sandia Employee Handbook, to argue

that violation of Sandia policy meant that he would be fired.  However, there is no directive

anywhere in the document with respect to disciplinary measures that should follow an infraction

of the policy or a failure to comply.   Disciplinary actions are determined by Sandia, which has

sole responsibility for personnel-related decisions.  *See* Gov't Ex. 1 (Wright Decl.), ¶ 7.

Defendant describes the statements he made to Dr. Hearne, Dr. Shinn and Ms. Koch as

involuntary, when these statements contained the same information that he gave in his interview

by CBP agents.   *See* Doc. 156-6 (CBP Memorandum of Contact with Deft.).  In his statement to

the CBP, Dr. Huang disclosed that he did not have proper permission to travel with the Sandia

laptop, and described his itinerary while in China, including the places at which he gave

presentations.   Thus, the substance of the statements Defendant claims were "compelled" was

previously given voluntarily prior to any of the statements he gave to Sandia officials or

supervisors.

Defendant's conduct on his return from China also belies his claim of a subjective belief

that he was compelled to make any of these statements.   On his own, he contacted several

Sandia employees to discuss his unauthorized taking of the laptop and the subsequent seizure of

the equipment.   Dr. Huang sent an e-mail to Ms. Jahner one month after he returned asking her

to schedule a debriefing on his trip to China, stating that he "made some serious mistakes during

the trip as you probably know, and I'm really sorry about this."  Tr., Doc. 276 at 561; Gov't Ex.

24.   When Ms. Jahner did not respond, Dr. Huang left her a voicemail message again asking for a travel debrief.  Tr., Doc. 276 at 563; Gov't Ex. 23.   Ms. Jahner responded that she was not ready to debrief him yet.  Tr., Doc. 276 at 564-65.   Defendant also reached out to fellow employee John Sullivan, sharing enough information with him to elicit Sullivan's advice about what to say in his voluntary statement to the CRC.   Tr., Doc. 276 at 579.   Government Exhibit 5 is an exchange of e-mails between Mr. Sullivan and Defendant, in which Defendant thanked "John" for offering ideas on how to phrase his statement, referring to the situation he was in as "the crap incident."  Tr., Doc. 276 at 585.

Sandia Director Charles Barbour testified that Defendant came to his conference room to offer an unsolicited apology for his conduct.  Dr. Barbour stated that Defendant told him many of the same things that were included in his statement to the CRC.   Tr., Doc. 275 at 509. Defendant denies having this conversation, but even without considering this evidence, it is clear that Dr. Huang repeatedly made voluntary, unsolicited admissions concerning his unauthorized use of the Sandia laptop which are the same as the statements he now claims were "compelled."

Another bit of evidence indicating that Defendant's testimony is not credible is Defendant's own description of his reasons for making these statements.   Dr. Huang admitted that he was motivated to make these statements in the hope that things would go better for him as an at-will employee who could potentially be terminated for his security breaches involving the laptop and hard drive:

Q.    And part of your motivation in answering [Sean Hearne's] questions was to preserve your job; is that right?

A.    Yeah, that is correct.

Q.    And not just to preserve your job because you're required to make statements if you're asked, but to preserve your job because you lost the laptop and hard drive?

A.      I have to report it, yes.  I have to cooperate with the manager.  I have to report to management.

Q.      Okay.  But perhaps I'm not being sufficiently clear.  You understood, didn't you, that you could be fired because of the loss of the laptop and hard drive?

A.      Yes.

Q.      And wasn't part of your motivation in providing this information to your management that you didn't want them—you didn't want to get fired about the loss of the hard drive and the laptop?

A.      Yes.

Tr., Doc. 276 at 558-59.   Thus, Defendant's objective was to get out in front of the situation and hopefully keep his job.  This is inconsistent with the notion of compulsion under *Garrity*, which is that the employee believes he is *required* to assist in the internal investigations or else lose his job.

Thus, the Court rejects Defendant's claim that he had a subjective expectation that he would be fired if he did not make the various statements at issue.   However, even if the Court assumed that Defendant satisfied this first prong, his subjective belief is not objectively reasonable.

B.      Defendant's Objective Belief That Statements Were Compelled

Based on the evidence and testimony elicited at the hearings on this matter, the Court finds Dr. Huang's claim of subjective belief that he would be fired if he did not make the statements at issue, is not objectively reasonable.[13]

Ms. Jahner testified that pre-briefing is conducted prior to traveling to sensitive countries so that Sandia employees have the "proper awareness before they go overseas."  Tr., Doc. 289 at

---

[13]   The Court notes that this two-pronged analysis on whether the statement was compelled would also apply to Defendant's statements to Ms. Jahner , if the Court had found that *Garrity* was applicable to that statement.   The same analysis would also be relevant to the statement Defendant  made to Dr. Hearne and Dr. Shinn immediately after Dr. Huang returned from China, if that statement had been obtained through state action.

310:7-8.    However, Ms. Jahner stated that she did not have any "enforcement power" and

could not "force anybody to comply with a travel prebrief. . . ."  *Id.,* at 310:13-15.    Should a

contractor refuse to comply with the pre-briefing, she could make recommendations, but could

not herself revoke someone's security clearance or terminate that individual.   Tr., Doc. 289 at

319.   Ms. Jahner stated that there was no set disciplinary action mandated for any of Dr.

Huang's conduct.    Dr. Huang faced termination as a possible consequence, but termination was

certainly not mandatory, although he would be subject to termination should the CRC determine

that to be appropriate:

Q.    Okay. And tell me, was that with regard to -- now, I don't know. There's lots of policies
      as we've become aware.  What I'm saying, a directive to comply with a -- provide a
      pretrip briefing, you don't know what the discipline would be for that.  Is that what you're
      saying?

A.    There is no set disciplinary action for that.

Q.    But you would agree it would be, if someone did that, they would be subject to discipline
      up to and including termination by the CRC?

A.    I'd agree that it could be anything from no action through termination, depending on the
      decision of a CRC.

Tr., Doc. 289 at 385-86 at 385-86:23-8.

Dr. Barbour testified that a refusal to participate in a travel pre-briefing would violate

DOE policy, but did not think the refusal would necessarily end up in a CRC proceeding.   He

indicated that the consequence of refusal would be simply that the contractor would be unable to

go on foreign travel.   Tr., Doc. 275 at 520, 522.   This testimony clearly indicates that

Defendant's stated belief that he would be fired if he refused to participate in the pre-briefing and

make the statements he did to Ms. Jahner, is not a reasonable belief for *Garrity* purposes.

Sandia Human Resource Director Karen Gardner, who was involved in the CRC hearing,

testified that there was no set discipline for a refusal to participate in a travel pre-briefing.  She

stated that such a situation called for further inquiry by Sandia supervisors, and that disciplinary action could range all the way from taking no disciplinary action, up to and including termination.  Tr., Doc. 275 at 457, 460.

Sean Hearne testified that if somebody chose not to follow the policy manual, it would "likely" result in another CRC.  Doc. 289 at 388:20-21.  Even so, that conduct may not ever evolve into a disciplinary proceeding.   Defense counsel asked Dr. Hearne what would have happened had Dr. Huang not reported the loss of the laptop to his supervisors upon his return, and whether he would be subjecting himself to discipline up to and including termination, to which Dr. Hearne answered:

A.:    Yes, I believe that is -- that is correct as any time as -- as we've discussed, you violate the policy manual, you may go to a CRC, you may have a CRC or a -- there may be a SIMP process. It is not -- it is not hardwired.

Doc. 289 at 392:18-25.   Had Dr. Huang refused to report the incident of the confiscated laptop to his supervisors, Dr. Hearne described the probable chain of events:

A.    I would have -- actually, I would have raised it to management, to my senior management, that the employee was not -- not willing to comply with the policy manual, and that would have been referred to HR, and then HR would have made a determination if they felt that it should go to a CRC or not, and that would **potentially lead up to anything from no action through termination.**

Doc. 289 at 393:11-17 (emphasis added).   Thus, the handling of a Sandia policy violation would go through several steps before landing at the CRC for a hearing, and possibly never getting to that point.   Dr. Hearne also explained that there were instances where members of a work group had refused to follow corporate policy, "and they were not terminated."   Tr., Doc. 289 at 385:20-22

Defendant's written statement to the CRC was on a form that bore the words "Option to Provide a Written Statement or Affirmation" across the top.  Gov't Ex. 14.  Marianne Walck,

director of the Geoscience, Climate and Consequence Effects Center at Sandia, and a member of

the CRC committee, testified at the hearing regarding the CRC process.   Dr. Walck stated that

her understanding was that an employee is invited to provide a statement voluntarily, and "they

can decline to provide the statement."   Tr., Doc. 275 at 485:5-9.   Charles Barbour also testified

that Defendant's statement to the CRC was optional.   Tr., Doc. 275 at 508:5-13:

Q.      Can you explain, is that standard language in every CRC notification?

A.      Yes, it is.

Q.      And what is it -- what is it requesting?

A.      We provide each employee whose case is going to be heard by the CRC an opportunity to
        provide a detailed written statement that they would like of any information that they
        would like for us to consider at the CRC table. And that is the standard language.

Q.      Is it a requirement to provide a statement?

A.      No, it is not required. We encourage.

Q.      That paragraph states, "Should you choose not to submit your written statement, sign and
        date the last page of the attached document."

Tr., Doc. 275 at 442: 8-21; and 508:12-14; Gov't Ex. 9.[14]

It is fair to say that Defendant faced *potential* termination if he refused to participate in

the SIMP investigation.  It is also very clear that Dr. Huang was not terminated as an automatic

or mandated consequence of his conduct.  However, this is not sufficient to find that any of his

statements—to Ms. Jahner, to his supervisors, or to the CRC—was compelled under *Garrity.*

Interestingly, in the end, Dr. Huang was not terminated solely because he lied to a Sandia

Counterintelligence Officer during a briefing, or solely because his actions resulted in the loss of

---

[14]    Defendant has conceded that the CRC process did not involve state action, and thus there is no need to
determine whether Dr. Huang's CRC statement was compelled under *Garrity.*   The Court includes this statement
only to show the absence of any compulsion anywhere along the line in the SIMP investigation, even when it landed
in a CRC proceeding.

Sandia equipment, but rather because of the CRC's determination regarding Dr. Huang's attitude

toward the incident, as Dr. Barbour recounted:

> Q.     What do you recall of the actual decision of termination?  Do you recall -- what
> do you recall of that, of that discussion by the three decision makers?
>
> A.     The decision. Okay. Well, we -- we went through and tried to **evaluate what the
> facts** were that we could know or could determine, you know, from the
> information that we had,  and then from that, we tried to decide whether or not
> this was something that was a simple mistake on his part that he just didn't
> understand things, in which case it's a -- it's a situation where he needs to be
> educated to understand it, or was it a situation where he actually knew the policies
> and whether he chose to violate the policies? **And so we came down on that
> side, And so we came down on that side, is that, yes, he said he knew what the
> policy was, and for expedience and for, you know, his own reasons, he chose
> to go ahead and violate that policy, which put us into a difficult position,
> because then that means it needs discipline.** So then there's a discussion of,
> okay, what's the appropriate level of discipline?

Tr., Doc.  275 at 511-512:18-16 (emphasis added).    According to Dr. Barbour, the CRC

concluded that it Dr. Huang's conscious and planned decision to ignore Sandia policy that

justified termination as a discipline:

Q.     . . . Over that period of time, did you come to form an opinion as to whether the
defendant was trying to express his point of view about the security incident?

A.     Okay. Did I form an opinion? Yes.

Q.     And what was that opinion?

A.     My opinion was that he did feel bad about what he did wrong, but he also knew
beforehand what he was, you know, planning to do, and then he went ahead and did it. So
it showed that he, as in cases, you know, we had seen before, he didn't always think the
rules completely applied to him.

Q.     Based on what you saw, do you think that the defendant was trying to keep his job?

A.     My opinion was that he did feel bad about what he did wrong, but he also knew
beforehand what he was, you know, planning to do, and then he went ahead and did it. So
it showed that he, as in cases, you know, we had seen before, he didn't always think the
rules completely applied to him.

Tr., Doc. 275 at 539:2-6.

The Court finds that testimony of these witnesses regarding the import of the policies, including its application to Dr. Huang's situation, is credible, consistent and undisputed.   Based on the testimony and evidence presented at the hearings and counsel's arguments, the Court finds that Defendant's claim that he would be fired if he refused to speak with Ms. Jahner, or to participate in either the SIMP inquiry or CRC proceeding is not objectively reasonable for purposes of *Garrity.*.[15]

C.     Defendant's Statements to Ms. Koch

There is not much left to consider in deciding whether Defendant's statements to Ms. Koch during the SIMP inquiry were compelled under *Garrity.*     Dr. Huang's testimony is the only evidence taking the position that he would be fired if he did not make the statements at issue, and the Court has already found this his testimony was neither credible nor consistent. On the other hand, all other evidence plainly supports the Government's position that termination was within a range of potential disciplines for conduct which violated Sandia policy.   All of this evidence shows that, before deciding on termination, there was lengthy and substantive discussion through the SIMP inquiry and the CRC process concerning the incident involving Dr. Huang; and the specific facts were considered and weighed before the CRC determined that termination was appropriate.

There is also specific evidence and testimony showing that Dr. Huang's statement to Ms. Koch, who handled the SIMP inquiry, was not compelled.  Ms. Koch testified that she is only authorized to conduct consensual interviews and request signed statements.  Tr., Doc. 289 at 325; Gov't Ex. 6, Att. 5, Sec. 1, 5(b) (DOE Order regarding "Inquiry Officials"):

---

[15]  Not only does the Court find these witnesses' testimony to be credible and reliable, but other evidence supports this testimony, such as Defendant's e-mail to colleague John Sullivan in which he describes his predicament as a "crap incident."  Tr., Doc. 276 at 585.

Q.      Okay. At any point during your communications with the defendant in -- in this inquiry, did you tell the defendant that he was required to answer your questions?

A.      No.

Q.      In fact, was he required to answer your questions?

A.      No.

Q.      Would you have had any authority to compel him to answer your questions if he had chosen not to?

A.      No.

Q.      Would you have had any authority to fire the defendant if he had chosen not to answer your questions?

A.      No

Tr., Doc. 289 at 341:5-16.   Ms. Koch described her interview with Dr. Huang, stating that, when she interviewed the defendant, she did her best to make him feel comfortable.   Tr., Doc. 289 at 333:6-13.   She went on to testify that, during the interview of August 18, 2011, the defendant "was understandably nervous, and he – he was very cooperative. He was remorseful. He spoke about that and – and just very willing to explain everything that happened."   *Id*. at 334:2-5. Defendant then wrote a summary of his interview with Ms. Koch and submitted it to her via e-mail. *Id*. at 336-37.   On cross examination by defense counsel, Ms. Koch agreed that all Sandia employees are required to cooperate with investigations by reason of Sandia corporate policy, commenting "well, all of us are, yes. It's a condition of employment."   *Id*. at 353:19.   However, as discussed previously, the violation of a condition of employment at Sandia does not necessarily result in termination.   Ms. Koch interpreted Sandia policy to mean that discipline up to and including termination could result from an employee refusing to comply with a SIMP investigation.   Tr., Doc. 289 at 354-355:24-2.   Ms. Koch also acknowledged that the SIMP inquiry had designated a low level of seriousness to the incident involving Dr. Huang, giving it a

24

score of 3.4 out of a possible 4, with 4 being the least serious.  Tr., Doc. 289 at 344:4-13.   She

stated that in her experience, she had not known employees to be terminated based on a 3.4 scale.

*Id.* at 344:17-19.[16]

Therefore, the Court finds no merit to Defendant's contention that he reasonably believed

that he would be fired for not responding to Ms. Koch's inquiries during the SIMP inquiry.

D.    Court Finds That No "Hobson's Choice" Existed for Defendant

Defendant has argued that Dr. Huang was faced with a "Hobson's choice" of either

making an incriminating statement or being fired.  *See U.S. v. Vangates*, 287 F.3d at 1321

(observing that *Garrity* is more easily applied to situations presenting a defendant with the

Hobson's choice of either making an incriminating statement or being fired than to cases in

which there has been no direct threat of termination.   The Court notes that a *Garrity* violation

can be found even where the state did not make a direct threat, but where it is "strongly implied."

*U.S. v. Camacho,* 739 F.Supp. 15104, 1515 (S.D. Florida 1990).   This is not one of those

situations.   Here, the uncontroverted evidence in this case establishes that Defendant potentially

faced a range of disciplines had he not made statements to Ms. Jahner, his supervisors, or to Ms.

Koch, and termination was only one of them.   Dr. Huang was never told at any point that he

risked being fired during the SIMP inquiry or CRC proceeding, and termination was not actually

considered until his situation was discussed and evaluated at the CRC meeting.

Defendant relies on *Lefkowitz v. Turley,* 414 U.S. 70 (1973) to support his contention that

his subjective belief was reasonable.  Doc. 298 at 11.   In *Turley*, two architects who did

occasional work for the State of New York refused to waive their Fifth Amendment privilege

before a grand jury investigating corruption in public contracting practices.  State law provided

---

[16]   This testimony reaffirms Dr. Barbour's testimony which attributed the termination to what the CRC considered
to be Dr. Huang's purposeful violation of Sandia policy.

that if a contractor refused to surrender his constitutional privilege before a grand jury, his existing state contracts would be canceled, and he would be barred from future contracts with the State for five years.   However, *Turley* only reinforces the Government's point that the threatened termination must be more than just one of the consequences facing the employee, or that the employee faces a heightened risk of the possibility of being fired.   Defendant also cites to *U.S. v. Friedrick,* 842 F.2d 382 (C.A.D.C 1988).   The defendant in *Friedrick* was an FBI agent who faced potential liability for making false statements during an investigation.  In that case, the court found that Friedrick's belief that he was compelled to answer questions on threat of dismissal was reasonable in light of his law enforcement experience and the conduct of previous interviews.   *Id.* at 392.   Neither of these cases resembles the facts in this case.   There was no testimony at all which suggested that Defendant was facing probable termination if he did not make the statements he made.   Instead, various witnesses presented consistent testimony that in the event discipline needed to be meted out for a policy violation or refusal to comply with Sandia policy, that discipline could be anything from taking no action at all to termination. The mere potential of termination does not meet the standard for compulsion under *Garrity.*

## CONCLUSION

The Court finds and concludes that none of the challenged statements made by Defendant constitute *Garrity* violations as statements that were compelled in violation of Defendant's Fifth Amendment rights.   Defendant has not met the threshold to establish a *Garrity* violation because he has not shown a credible subjective belief that he would be fired unless he made those statements; and because he has not shown this belief to be objectively reasonable.   Accordingly, there is no reason to suppress any of these statements, nor is there a need for the Court to hold a *Kastigar* hearing.   The Court's findings above can be summed up as follows:

- Because Dr. Huang's statement to Ms. Jahner is the alleged lie itself, and not a potentially incriminating statement about the lie, it is not afforded Fifth Amendment protection, and therefore *Garrity* is inapplicable;

- Defendant's statement to Dr. Shinn and Dr. Hearne were not obtained by state action. Thus, the statement does not implicate *Garrity* and there is no basis to suppress it;[17]

- The statements obtained from Defendant by state action (statements to Ms. Jahner and Ms. Koch), were not compelled for purposes of *Garrity*.

  o First, Defendant's claim that he subjectively believed that he would be fired if he did not make these statements is not credible based on the inconsistency of his claim in light of his other testimony and on his conduct throughout the course of the investigation.

  o Second, Defendant lacked an objectively reasonable basis to believe that he would be fired if he did not make those statements, or that the Government was threatening to fire him.  Termination was one of several disciplinary options for policy violations, and thus Defendant cannot reasonably claim that he felt "compelled" to make the statements on pain of termination.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Dismiss Counts 1-7 of the Superseding Indictment for Government's Failure to Comply with *Garrity v. New Jersey* and *Kalkines v. United States* **(Doc. 144)** is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

---

[17]   In light of the Court's findings regarding Defendant's statements to Ms. Jahner, Dr. Shinn and Dr. Hearne, there is no need to determine whether these statements were compelled under *Garrity,*  However, the Court has included these statements in its analysis, making it clear that even these statements were not compelled in violation of Defendant's Fifth Amendment rights.